# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SALVO GUNS LLC,<br><br>Plaintiff,<br><br>v.<br><br>SILENCERCO, LLC,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:15-cv-112<br><br>Judge Robert J. Shelby |

This case involves a dispute over the name "Salvo." Plaintiff Salvo Guns holds a trademark on the name, and brought this suit against Defendant SilencerCo after SilencerCo began manufacturing a shotgun silencer it named the "Salvo 12." SilencerCo contends the suit is baseless because Salvo Guns no longer owns the mark, having sold it as part of the 2014 sale of its Layton, Utah location to a third party. SilencerCo has now moved for summary judgment on this basis. For the reasons below, the court concludes SilencerCo has not met its burden of demonstrating that Salvo sold or does not otherwise own the mark.

## BACKGROUND

Prior to 2014, Plaintiff Salvo Guns owned and operated a firearms facility in Layton, Utah. The facility featured a shooting range and a retail sales location for firearms and firearm accessories. In 2014, Salvo entered into a contract with Get Some Guns & Ammo—who is not a party to this case—to sell the facility. Get Some, a competitor who was already operating several shooting ranges and retail stores, subsequently began operating the facility under its own name.

Later that year, Defendant SilencerCo, a local manufacturer of firearm accessories, began producing and marketing a shotgun suppressor it called the "Salvo 12." SilencerCo attempted to

register the mark "SALVO" with the Patent and Trademark Office, but received an initial denial on account of Salvo's already-existing "Salvo Guns" Registration. SilencerCo subsequently filed a petition to cancel the Registration on the basis of abandonment. Salvo responded by filing this lawsuit, which stayed the PTO action. SilencerCo has now moved for summary judgment.[1]

## ANALYSIS

Salvo's Complaint asserts various federal and state law trademark and tort claims, all of which are premised on the theory that Salvo retained the "Salvo" mark after the sale of its Layton location to Get Some. Salvo contends that Get Some and Salvo never intended to transfer the mark in the sale, as Get Some was interested only in the physical location and assets. SilencerCo contends that regardless of Salvo's and Get Some's subjective intentions, the use of certain language in the sale contract means the mark was necessarily transferred as a matter of law, so Salvo no longer owns it. Alternatively, SilencerCo argues Salvo abandoned the mark. The court addresses each argument in turn.

### Whether the Mark Was Sold to Get Some

The court first addresses whether the mark was transferred in the transaction between Salvo and Get Some. SilencerCo's primary argument on this point is that the mere use of the phrase "good will" in the sale contract caused the mark to be sold, whether Salvo and Get Some intended that result or not. The court first addresses this argument, and then turns to whether the intent of the parties—as evidenced by the contract language and extrinsic record evidence—was that the mark be sold in the Get Some transaction.

---

[1] Summary judgment is appropriate only if there is "no genuine dispute as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). SilencerCo carries the initial burden of demonstrating the absence of any genuine dispute of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court will draw any reasonable inference from the evidence in the light most favorable to Salvo Guns, the nonmovant. *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

## I. Inclusion of "Good Will" in the Contract

SilencerCo's primary argument, as discussed, is that the use of certain words in Salvo's contract necessarily caused its mark to be sold to Get Some as a matter law, regardless of what the remainder of the contract or any extrinsic evidence demonstrates about the intent of the contracting parties. Initially, that argument was focused on the inclusion of "good will" in the contract; because the contract included the sale of the business's "good will," and because "good will" under Utah law unequivocally includes trademarks, SilencerCo argued, the business name and trademark were necessarily sold in the transaction. This argument evolved, however, and at oral argument SilencerCo's position was that the sale of "good will" *plus* the contract's sale of the entire business and its inclusion of a covenant not to compete meant, regardless of the contracting parties' intentions, that the mark was necessarily sold. The court will take each argument in turn.

As discussed, SilencerCo's initial argument was that Salvo's and Get Some's intentions as to whether the Salvo mark would be sold are irrelevant because they choose to use the term "good will" in their contract, which, according to SilencerCo, means the mark transferred as a matter of law.[2] But this presumes that "good will" includes trademarks under Utah law, which is not necessarily the case. In Utah, good will *can*, but need not include trademarks or tradenames. Indeed, "good will" under Utah law can mean many things. It can be broadly described as "the general public patronage and encouragement which [an establishment] receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill

---

[2] The court is skeptical that even if "good will" had a fixed meaning under Utah law, and even if that fixed meaning included trademarks, that the parties could not knowingly and explicitly contract around that meaning—for example, by defining good will and making clear that it does not include the name "Salvo" or any intellectual property associated with it. The court need not address this issue, however, because, as discussed below, that is not the state of the law in Utah.

3

or affluence, or punctuality, or from other accidental circumstances."[3] It is the "probability that old customers will resort to the old place to seek old friends, and the likelihood of new customers being attracted to well advertised and favorably known services or goods."[4] It can reside in the business entity itself—"enterprise goodwill"—or in people associated with the entity—"personal goodwill."[5] It can derive from the location of a business, the name of the business, the people employed by it, or those managing it. In short, "good will" in Utah can mean just about whatever contracting parties intend it to mean. Contrary to SilencerCo's contention, however, it need not necessarily include trademarks or tradenames.[6]

At oral argument SilencerCo narrowed this argument somewhat, contending that even if inclusion of "good will" in the contract did not itself transfer the mark, the addition of the sale of the entire business plus the covenant not to compete means the mark was necessarily sold, regardless of the contracting parties' intentions.[7] But even this narrowed proposition proves too much. Utah cases state merely that this is the "general rule,"[8] and they make clear that

---

[3] *S. Utah Mortuary v. Roger D. Olpin S. Utah Mortuaries*, 776 P.2d 945, 948 (Utah Ct. App. 1989).

[4] *Peterson v. Jackson*, 253 P.3d 1096, 1106 (Utah Ct. App. 2011).

[5] *Id.*

[6] *See, e.g.*, *S. Utah Mortuaries*, 776 P.2d at 949 (holding that "good will" passed to buyer of second and third mortuaries, but "good will" in that case did not include the trade name because the trade name had already been transferred to the buyer of the first mortuary). The cases SilencerCo relies on for its argument to the contrary are either factually distinct or extrajurisdictional. *See, e.g.*, *Dovenmuehle v. Gilldorn Mortg. Midwest Corp.*, 871 F.2d 697 (7th Cir. 1989); *Marshak v. Green*, 746 F.2d 927 (2nd Cir. 1984); *Lantz Bros. Baking Co. v. Grandma Cake Co.*, 34 C.C.P.A. 1073 (C.C.P.A. 1947); *Holly Hill Citrus Growers' Assoc. v. Holly Hill Fruit Prods., Inc.*, 75 F.2d 13 (5th Cir. 1935). SilencerCo does cite *Oklahoma Beverage Co. v. Dr. Pepper Bottling Co.* from the Tenth Circuit, but the *Oklahoma Beverage* court was not applying Utah law, and moreover, the court held only that where an "entire business" was sold and where that business and its good will "are transferred to another who continued the operation under the same trademark," the trademark transferred. 565 F.2d 629, 632 (10th Cir. 1977). The case does not stand for the proposition that under Utah law, "good will" necessarily includes trademarks.

[7] *See* Feb. 2, 2017 Hearing at 46:39 (Court: "So the legal principle, and you say this is an established matter of law so much so that the parties are not permitted to make an agreement otherwise, is that where a party sells all of its assets in a purchase agreement, and includes good will, whether they intend to hold back some intellectual property that they own or otherwise, they can't." Defense Counsel: "That's exactly what I'm saying.").

[8] *Peeples v. Wolfe*, 430 P.2d 574, 575 (Utah 1967).

notwithstanding this general rule a trademark can, depending on the circumstances, be transferred only for limited use,[9] or not at all.[10] Moreover, SilencerCo cannot even invoke this general rule, for as will be discussed below, it is not at all clear that Salvo sold Get Some its entire business.

In short, SilencerCo has not shown that the intent of the contracting parties in this case is irrelevant to the question of whether Salvo sold the "Salvo" trademark to Get Some. It has not established that "good will" in a sales contract necessarily includes trademarks under Utah law, nor that adding the sale of the entire business plus a covenant not to compete necessarily changes anything, nor that Salvo's contract even meets this standard. Thus, the court turns to the intent of the contracting parties.

## II. The Contracting Parties' Intent

Having concluded the terms of the contract identified by SilencerCo do not, as a matter of law and without regard to intent, establish Salvo's trademark was sold with its Layton location, the next question is whether SilencerCo has shown that the contracting parties intended that result. To determine intent the court looks first to the language of the contract as a whole.[11] In the absence of ambiguity, the parties' intentions can be ascertained from the contract language alone.[12] But where an ambiguity exists—that is, where a term or provision is capable of more

---

[9] *See S. Utah Mortuaries*, 776 P.2d at 948 ("The right to use a trade name representing a business's good will may be transferred to a limited geographical territory, with rights to the name retained or assigned to another in a different location.").

[10] *See id.* at 949 (concluding that sale of an ongoing business, along with a covenant not to compete, presumptively included the business's good will, but that "good will did not include the rights to the name").

[11] *Mind & Motion Utah Investments, LLC v. Celtic Bank Corp.*, 367 P.3d 994, 1001 (Utah 2016).

[12] *Id*.

than one reasonable interpretation—the court turns to extrinsic evidence for indicia of intent.[13] If, at that point, the ambiguity persists, questions of fact preclude summary judgment.

On the question of whether the contracting parties intended that the mark be sold, there are two theories under which SilencerCo might be granted summary judgment: (1) if the contracting parties intended that Salvo's entire business be sold, that, coupled with the inclusion of good will and the covenant not to compete, would establish at least a presumption under Utah law that the Salvo mark was sold as well; or (2) even if the entire business was not sold, if the contracting parties intended that "good will" include the Salvo mark, SilencerCo would be entitled to judgment, as the contract includes "good will" in the sale. The court first addresses whether the contract language unambiguously establishes either of these theories, and then, finding it does not, turns to whether SilencerCo has provided extrinsic evidence sufficient to demonstrate the contracting parties intended either result.

**A. Contract Language**

The first question is whether the contract itself unambiguously establishes that the parties intended Salvo's entire business to be sold, for if that is so, as discussed above, Utah law provides at least a presumption that the Salvo mark was transferred as well.[14] In answering this question the court assesses whether the contract language is "capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."[15] If so, the contract is ambiguous, and not itself determinative of intent.

---

[13] *Id.*

[14] *See Wolfe*, 430 P.2d at 575 (nothing that the "general rule" is that "in a voluntary sale of business as an entirety, trade-marks and trade-names which have been lawfully established and identified with such business will pass to one who purchases as a whole the physical assets or elements of the business").

[15] *Mind & Motion Utah Investments*, 367 P.3d at 1001.

Several aspects of Salvo's contract demonstrate that it could be reasonably interpreted to reflect the parties' intentions to transfer something less than the entire business. Most striking, perhaps, is that nowhere does the contract mention service marks, trademarks, or the transfer of the name "Salvo." By contrast, the contract is meticulously detailed as to what *was* sold, listing, for example, one "mop bucket," one "mop ringer," an "open sign," and three "bar code readers," among other items.[16] To be sure, explicitly listing the mark is not necessarily a requirement for the mark to be transferred, but it is a factor supporting the reasonableness of an interpretation that it was not.

Next, the contract allocates the entire purchase price to "Real Estate."[17] SilencerCo interprets this as Salvo playing "accounting games" for tax purposes. That may be so, but equally reasonable is the interpretation that some aspects of Salvo's business were excluded from the sale—namely, nontangible assets like the company's name and its ability to use that name in connection with other physical or online locations.

In that vein, the contract contains a noncompete provision that prohibits Salvo from operating a business under a name similar to "Salvo" in Utah for three years.[18] SilencerCo contends this provision supports the notion that the "Salvo" name was sold because this provision serves to provide additional protection by prohibiting Salvo from using *similar* names. This may be a reasonable interpretation, but similarly reasonable is the possibility that the parties intended Salvo to sell only the Layton location and retain the ability to operate a business using the Salvo name outside Utah, or inside Utah after the three-year window closed. In short, these

---

[16] Dkt. 29-8.
[17] Dkt. 21-1 at 23.
[18] *Id*. at 27.

7

provisions, and the contract as a whole, reasonably support either of two theories: that the entire business was sold, or that it was not. For that reason, the contract is ambiguous on this point.

As to the second theory—that the contract language unambiguously shows the parties intended that "good will" would include the Salvo mark—the court is not convinced. It is certainly reasonable to conclude that "good will" was intended to include the mark. Similarly reasonable, however, is that the parties intended "good will" to mean something else—for example, the services of Salvo's former employees, or the business of Salvo's former customers.

SilencerCo contends this alternative interpretation is not reasonable because these items are already alluded to in varying degrees of specificity elsewhere in the contract, including in a provision granting Get Some the ability to hire Salvo's former employees[19] and an attached schedule that "lists, by category, all . . . memberships, punch passes, classes, [and] gift cards . . . that are subject to this transaction."[20] But interpreting "good will" to include former Salvo employees or customers would not, as SilencerCo suggests, render these other provisions meaningless. Indeed, the provisions could reasonably be interpreted to provide additional information related to those transfers. For example, Section 15, dealing with employees, not only makes clear that Get Some can hire Salvo's former employees, but lays out how that transfer might happen, explaining that "immediately prior to Closing, Seller will dismiss its employees, who may thereafter be hired by Buyer in Buyer's sole discretion."[21] And Schedule B

---

[19] *Id.* at 28.

[20] *Id.* at 24.

[21] *Id.* at 28.

lists not just the fact that memberships, punch passes, classes, and gift cards would transfer, but the amount of liability outstanding on each.[22]

In sum, the contract can reasonably be interpreted to mean either that the entire business was sold, or that some portion of it was retained by Salvo. Similarly, "good will" can reasonably be interpreted to include trademarks, or not. Thus, SilencerCo has not demonstrated that the contract language unambiguously establishes the parties' intent on either point.

**B. Extrinsic Evidence**

Having concluded the contract language is ambiguous both as to whether the contracting parties intended the entire business be sold and whether they intended "good will" to include the trade name, the court turns to the extrinsic evidence in the record.[23] And this evidence strongly suggests that the parties intended neither that the transaction would involve Salvo's entire business nor that it would include Salvo's mark.

The relevant extrinsic evidence in the record consists primarily of a declaration and supporting documentation by Brent Mitchell—one of Salvo's founders and a party to the negotiation of the Get Some sale. Mitchell testified that Get Some did not offer to purchase all of Salvo, nor did Salvo intend to sell its entire business.[24] Rather, both parties intended that Get Some would "purchas[e] the physical facilities at the Layton location."[25] According to Mitchell, Salvo has, since the sale, remained an ongoing business in good standing, and it intends to sell its

---

[22] *Id.* at 24; Dkt. 29-8 at 3.

[23] *Mind & Motion Utah Investments, LLC v. Celtic Bank Corp.*, 367 P.3d 994, 1001 (Utah 2016) (noting that reviewing extrinsic evidence is not only appropriate but required in light of a contract's facial ambiguity).

[24] Dkt. 29 ¶¶ 8, 16.

[25] *Id.* ¶ 8.

firearm accessories nationwide after its noncompete agreement expires.[26] For support, Salvo put in the record copies of designs for accessories it intends to sell.[27] As to Get Some, Mitchell testified that Get Some indicated during negotiations that it intended to run the Layton location under its own name, and the only evidence in the record is that it has done just that.[28] In short, the record evidence suggests that the parties intended that Get Some would purchase Salvo's physical Layton store, not its name.

SilencerCo provides two pieces of extrinsic evidence it contends demonstrate otherwise. First, it points out that Salvo allowed its registration with the Utah Division of Corporations and Commercial Code to lapse in 2015 and failed to renew until the day SilencerCo filed its petition to cancel Salvo's mark. This could certainly lend support to an interpretation that Salvo intended not to resume business. But an oversight in renewal does not necessarily equate to an intent to cease operations, and cutting against this interpretation is the fact that Salvo timely renewed in 2014 and 2016.[29]

SilencerCo next argues that Salvo informed "the entire world" (via its website and tax returns) that it was no longer conducting business. After the sale, Salvo posted an announcement on its website that it had "accepted an offer from 'Get Some Guns' for the purchase of Salvo Guns," and that Get Some would continue to honor existing memberships.[30] It also noted on a

---

[26] *Id.* ¶¶ 11, 14.

[27] *Id.* ¶ 14; Dkt. 29-7.

[28] Dkt. 29 ¶¶ 8, 10.

[29] SilencerCo hints at the possibility that the 2014 renewal may have come *before* the January 13, 2014 sale to Get Some, and argues that that renewal is therefore not evidence of Salvo's intent to continue business after the sale. This is SilencerCo's Motion, however, and it was SilencerCo's burden to put in the record evidence of the renewal date if it wished to rely on that argument. Having not done so, the issue is at best ambiguous, and does not weigh in SilencerCo's favor.

[30] Dkt. 21-3.

Return of Partnership Income Form 1065 that the Return would be a "Final Return."[31] While this could be interpreted to indicate Salvo intended to cease conducting business altogether, Salvo explains that the website served solely the Layton location, so the posting reflected only the closing of that location, not necessarily the cessation of Salvo's entire business. Similarly, Salvo reports it closed the tax ID for its Layton operation on the advice of an accountant to avoid continuing health insurance compliance obligations. Drawing inferences in Salvo's favor, as the court must at this point, this evidence demonstrates only that the Layton location was sold—an inference that is further strengthened by the fact that the website salvoguns.com was not transferred in the sale but instead remained under Salvo's control.[32]

In short, the extrinsic evidence suggests the parties intended not to sell Salvo's entire business. It also suggests the parties intended that "good will" would not include the trade name. From all accounts, Get Some never intended to use the name "Salvo" and has in fact not used it. And it appears Salvo has always intended to continue using the name, is currently using it in some capacity, and plans to use it in the future. SilencerCo has not met its burden of demonstrating that Salvo and Get Some intended to sell the entire business, including the mark.

---

[31] Dkt. 21-1 at 42. SilencerCo also represented to the court in its papers that a "cover letter for [Salvo's] 2014 tax returns" states "[t]his is the final year that Salvo Guns, L.L.C. will file a Return of Partnership Income." Dkt. 21 at 6. It appears, in fact, that this document is not a cover letter Salvo submitted to the IRS with its 2014 return, but rather a letter from Salvo to one of its partners. Dkt. 21-1 at 37. Thus, this document does not support SilencerCo's contention that Salvo "represented to the IRS . . . that 'Salvo Guns' had been sold and was no longer conducting any business." Dkt. 21 at 9, 10, 11, 13, 14, 24.

[32] SilencerCo contends this nonetheless weighs in its favor because, according to SilencerCo, the Layton location was the entirety of Salvo's business. That contention is belied by the Mitchel declaration, which states that "Salvo maintained its business after the sale of the Layton location to Get Some because it had other business opportunities, plans, and assets that were not sold to Get Some." Dkt. 29 at 4. SilencerCo has not met its burden of providing evidence to the contrary, so the issue is at best ambiguous.

### Whether the Mark Was Abandoned

SilencerCo also argues, alternatively, that Salvo's claims fail because it abandoned the mark. A mark can be abandoned if (1) its use is discontinued with intent not to resume, or (2) the owner engages in conduct that causes the mark to become a generic name or lose its significance.[33] SilencerCo conceded at oral argument it is proceeding only under the second theory, and that this argument more or less rises and falls with its argument that the mark was sold.[34] Indeed, SilencerCo's argument on this point is that "with the sale of the business, the trade name passed, [and Salvo] has . . . caused the mark to lose significance."[35] The court has already concluded that SilencerCo has shown neither that the entire business was sold nor that the trade name passed, so its abandonment argument fails.[36]

### CONCLUSION

SilencerCO has not shown the "Salvo" trademark was sold, nor has it shown Salvo abandoned the mark. SilencerCo's Motion for Summary Judgment[37] is therefore DENIED.[38]

**SO ORDERED** this 19th day of December, 2017.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[33] 15 U.S.C. § 1127.

[34] *See* Feb. 2, 2017 Hearing at 52:30; *id.* at 52:21 ("The abandonment argument, your honor, is the same.").

[35] *Id.* at 52:44.

[36] SilencerCo also moved for summary judgment on its counterclaim for Cancellation of Trademark, asking the court to cancel Salvo's mark on the basis that Salvo abandoned the mark or can no longer exercise control over the mark. 15 U.S.C. § 1064(3). Because SilencerCo has shown neither, its Motion for Summary Judgment on the counterclaim is denied.

[37] Dkt. 21.

[38] SilencerCo's request for attorney fees is also denied.